IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VEOLIA NORTH AMERICA REGENERATION SERVICES LLC | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. |
| NORAM ENGINEERING & CONSTRUCTORS LTD, | ) ) ) ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Veolia North American Regeneration Services LLC ("Veolia"), by and through its undersigned counsel, alleges the following against Defendant NORAM Engineering & Constructors Ltd. ("Noram"):

## NATURE OF THE CLAIM

1. This action arises out of Noram's defective design, manufacturing, and installation of heavy industrial equipment at a sulfuric acid regeneration plant owned and operated by Veolia. As a result of the provision of this defective equipment, Veolia has incurred substantial out-of-pocket maintenance and repair costs and suffered further damage as a result of the ensuing plant downtime and associated production losses.

2. Despite Noram failing to install a crucial piece of equipment included in its original design specifications, Noram has refused to take responsibility for this negligent oversight or honor the express and implied warranties governing its scope of work.

## THE PARTIES

3. Plaintiff Veolia North American Regeneration Services LLC is a Delaware limited liability company with its principal place of business located at 53 State Street, 14th Floor, Boston,

Massachusetts, 02109.  Veolia is a subsidiary of Veolia Environment S.A. and is engaged in the operation and maintenance of industrial chemical manufacturing facilities including sulfuric acid regeneration plants.

4. Defendant NORAM Engineering & Constructors Ltd. is located at 200 Granville Street, Suite 1800, Vancouver, British Columbia, Canada V6C 1S4.  Noram provides global construction, engineering, and manufactured equipment packages to the chemical, pulp and paper, minerals processing, wastewater, and electrochemical sectors with particular expertise in the fields of nitration, sulfuric acid, and electrochemistry.

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

6. This Court has personal jurisdiction over Defendant Noram because Noram is bound by the Delaware forum-selection clause in Section 14 of the applicable agreement – the Chemours Equipment and/or Parts P.O. Terms and Conditions – Long-Form (the "Agreement").

7. Venue is proper within this District under 28 U.S.C. §§ 1391(b)(3) and (c)(3).  The Agreement designates this District as the venue for resolving claims arising between the parties.

**FACTUAL ALLEGATIONS**

8. Plaintiff Veolia owns and operates a sulfuric acid plant at its Burnside facility located in Darrow, Louisiana ("the Burnside Facility").  Veolia acquired the Burnside Facility as a result of a July 2016 acquisition of the sulfur products division of Chemours Company FC, LLC ("Chemours").  As a result of this acquisition, Veolia acquired all of Chemours' rights and obligations under the Agreement.

1

9. The Burnside Facility is a merchant sulfuric acid recovery and sulfur product plant which converts spent sulfuric acid into fresh commercial grade sulfuric acid, and produces sulfur-based products for use in petrochemical refining and other industrial activities.

10. On November 17, 2015, Veolia's predecessor in interest, Chemours, issued a formal request for quote ("RFQ") for the replacement of the existing converter equipment at the Burnside Facility. The purpose of the replacement was to reduce future capital and maintenance costs. The scope of work included the design, manufacturing, and installation of a replacement stainless steel converter including all converter nozzles, ducts, and tie-rods. The RFQ conditioned any quotes on the acceptance of Chemours' standard terms and conditions, expressly stating that "[a]ny resulting order shall be in accordance with Chemours Equipment PO Terms and Conditions Rev. 11-09-2014" which were supplied with the RFQ.

11. On December 11, 2015, Noram accepted the terms of the RFQ by submitting a $9,244,500 quote which outlined Noram's proposed design for the subject equipment, and touted the benefits of Noram's converter as a "proven design product that will benefit the Burnside Plant facility by significantly reducing capital and maintenance costs."[1]

12. After Chemours and Noram met on January 28, 2016 to further discuss Noram's original quote and design proposal, Noram submitted a revised $7,790,572 quote on February 3, 2016. Chemours accepted the revised quote, and on February 25, 2016 Chemours issued Purchase Order No. 9900249784, which commenced Noram's scope of work at the Burnside Facility. The purchase order expressly stated that it was issued "in accordance with the Chemours Equipment and/or Parts P.O. Terms and Conditions - Long Form as agreed upon with NORAM Engineering."

---

[1] Noram's quote purported to modify certain of the terms and conditions of the Agreement, but those proposed modifications were rejected, as described herein, and Noram later fully accepted the terms and conditions of the Agreement.

13. After the July 2016 acquisition of the Sulfur Products division of Chemours by Veolia, Veolia and Noram entered into Purchase Order No. 9900435967 on February 27, 2017 governing the Chemours (Veolia) converter replacement project. Per the Purchase Order, Noram was required to provide design and engineering for the Chemours converter replacement project in accordance with the specifications contained or referenced in the Purchase Order, which were the minimum requirements for furnishing all designs, drawings, materials, equipment, tools, accessories, labor and supervision necessary for the design, fabrication, and testing of the converter replacement equipment.

14. In order to clarify the applicable terms of the Agreement after the acquisition of Chemours by Veolia, the parties entered into a series of amendments and/or Change Orders which included the need to perform a Finite Element Analysis ("FEA") and Report of Burnside Replacement Converter Bed-1 Outlet Nozzle and Ducting. There were also clarifications made to sales tax and other outstanding items that did not transition correctly from Chemours to Veolia.

15. Among other amendments to the Purchase Order, on May 28, 2018, Veolia and Noram executed Change Order No. 2, which acknowledged, confirmed, and agreed that the work performed by Noram under the Purchase Order was governed by the original "Terms and Conditions identified as the Chemours Equipment and/or Parts P.O. Terms and Conditions - Long Form as agreed upon between the Parties."

16. After a lengthy delivery and installation process, the converter was put into service in June 2019. On or about June 28, 2019, after a brief period of operation, Veolia discovered a drastic distortion and failure in the converter preheat duct designed by Noram. This distortion manifested itself as a permanent contorted and uncontrolled positioning of the expansion joints causing damage to all adjacent platforms and associated structural supports, as well as creating a

severe and permanent deflection of the main vessel (converter) upper and lower nozzles (at the 1st and 4th passes, respectively) creating the strong possibility that the converter duct would rupture and release $SO_2$, $SO_3$, nitrogen, and other highly toxic materials which would adversely impact the environment and cause the immediate shutdown of the Burnside Facility.

17. Immediately after the distortion was discovered, on July 1, 2019, Veolia contacted Noram concerning the distortion of the preheat duct, providing several photos and descriptions of the damage observed to the ducts, including offsets of the expansion joints of as much as twenty (20) inches.

18. After Noram conducted a series of unsuccessful diagnostic visits to the Burnside Facility, several Veolia employees traveled to Noram's Vancouver office from July 30 – August 1, 2019 in order to review the Noram design process, participate in a Noram analysis of the preheat duct, and obtain Noram's agreement to honor its warranty and take immediate steps to re-design, remedy, and replace the defective converter duct.

19. During this design review meeting, Noram engineers concluded that the converter preheat duct distortion was attributable to overstretching of expansion joints which, inexplicably, lacked tie-rods. Noram further conceded that its original design drawings included expansion joint tie-rods that would have prevented the duct distortion. After a reasonable investigation, Noram concluded that the tie-rods should have been included in the final equipment specification design, and attributed the oversight to human error.

20. Veolia has subsequently become aware of additional defects and deficiencies in Noram's converter duct that required remediation in order to ensure that the fabricated converter was fit for its intended purpose and would not fail and distort as before.

21. Noram then designed a replacement converter duct that was fabricated and shipped to the Burnside Facility for installation. At the same time, Veolia retained the services of a third party engineer to review the re-design by Noram. This third party review revealed that Noram's re-design was once again defective and in fact created greater problems and deflection than the original Noram design. For this reason, Veolia was unable to install the converter duct fabricated based on Noram's re-design and was instead forced to procure the services of a replacement engineer to design, fabricate, and install a replacement converter duct to remedy Noram's defective work.

22. In October 2019, Veolia issued notice of a warranty claim against Noram under the Agreement, and requested reimbursement for the cost of the replacement preheat duct and associated equipment which Noram installed.

23. Noram rejected Veolia's warranty claim, and has continued to refuse to honor its warranty obligations and/or reimburse Veolia for any of the costs associated with its omission of the expansion joint tie-rods.

24. As a result of Noram's defective performance and refusal to honor its warranty obligations, Veolia has suffered damages in excess of the jurisdictional limits of this Court including, but not limited to: (i) out-of-pocket costs to design, fabricate, and install a replacement converter duct that corrected the omission of expansion joint tie-rods in Noram's original design and reposition major components in the ducting run to eliminate excess stress on the vessel nozzles; (ii) lengthy unplanned outages and downtime; (iii) increased operational costs; and (iv) lost production and profit associated with the operational disruptions experienced at the Burnside Facility.

**COUNT I**
**BREACH OF CONTRACT**

25. Plaintiff Veolia incorporates by reference and realleges each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

26. The Agreement is a valid and binding contract enforceable against Noram.

27. Pursuant to Section 6.1 of the Agreement, Noram warranted, among other things, that the equipment supplied to Veolia would: "(a) be free of defects in materials, workmanship and design; (b) meet the Specifications; and (c) comply with the implied warranties of merchantability and fitness for a particular use."

28. Noram breached this warranty provision when it provided Veolia defective equipment which omitted crucial structural elements necessary for the continued operation of the Burnside Facility converter.

29. Veolia has fully performed its obligations under the terms of the Agreement.

30. As a proximate result of Noram's breaches of contract, Veolia has suffered, and will continue to suffer, damages in an amount to be proven at trial. Veolia seeks compensation for all damages and losses proximately caused by these breaches.

## COUNT II
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

31. Plaintiff Veolia incorporates by reference and realleges each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

32. Delaware law implies a warranty in the contract for the sale of all goods that the goods shall be merchantable if the seller is a merchant with respect to the goods in question. 6 *Del. C.* § 2-314. Accordingly, Noram, a merchant of heavy equipment in the sulfuric acid manufacturing industry, impliedly warranted to Veolia that the converter equipment it supplied would meet the description of the equipment provided Veolia, and would be suitable for the ordinary purpose of those goods in the sulfuric acid manufacturing and regeneration industry.

33. The equipment supplied by Noram failed to comply with this implied warranty as a result of its failure to conform to the original design specifications provided Veolia and/or be suitable

for the ordinary purpose for which such converter equipment is used in the sulfuric acid manufacturing and regeneration industry.

34. As a proximate result of Noram's breaches of the implied warranty of merchantability, Veolia has suffered, and will continue to suffer, damages in an amount to be proven at trial. Veolia seeks compensation for all damages and losses proximately caused by these breaches.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF FITNESS

35. Plaintiff Veolia incorporates by reference and realleges each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

36. Delaware law implies a warranty in the contract for the sale of all goods that the goods shall be suitable and fit for the particular purpose they were intended. 6 *Del. C.* § 2-315.

37. At the time of contracting, Noram had reason to know of the particular purpose for which the equipment was required, including detailed specifications in the RFQ of the equipment needed for the Burnside Facility. Noram was aware, or had reason to be aware, of the particular purpose for which this equipment was required, including the need for the support equipment associated with the ductwork such as appropriate tie-rods supporting the expansion joints. Veolia relied on Noram's skill and judgment to select equipment suitable for this purpose.

38. Noram was aware, or had reason to be aware, of Veolia's reliance on its skill and judgment to select equipment suitable for this purpose.

39. The equipment supplied by Noram failed to comply with this implied warranty as evidenced by the distortions in the converter preheat duct shortly after Noram completed installation. These distortions rendered the entire converter incapable of sustained operation and therefore unfit for its particular purpose.

40. As a proximate result of Noram's breaches of the implied warranty of fitness, Veolia has suffered, and will continue to suffer, damages in an amount to be proven at trial. Veolia seeks compensation for all damages and losses proximately caused by these breaches.

## COUNT IV
## NEGLIGENCE

41. Plaintiff Veolia incorporates by reference and realleges each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

42. In the alternative, Veolia pleads recovery under the doctrine of negligence.

43. Noram owed a duty to Veolia to design, manufacture, and install the converter equipment with the ordinary care and skill exercised by similarly situated professional engineers and contractors. Noram breached that duty by omitting crucial design elements from the installed equipment, despite these elements being included in Noram's original design specifications.

44. As a result of Noram's failure to include these elements, in particular expansion joint tie-rods providing long-term structural stability to the converter, Veolia has suffered, and will continue to suffer, damages in an amount to be proven at trial. Veolia seeks compensation for all damages and losses proximately caused by Noram's negligence.

## COUNT V
## UNJUST ENRICHMENT

45. Plaintiff Veolia incorporates by reference and realleges each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

46. In the alternative, Veolia pleads recovery under the doctrine of unjust enrichment.

47. Noram received the benefit of payment for the supply of the Burnside Facility converter equipment despite failing to provide Veolia with the equipment specified. As a result of this failure, Veolia incurred additional expenses in the form of the purchase and installation of

replacement equipment, increased operating costs, significant and unexpected Burnside Facility downtime, and lost profits.

48. It would be unjust under these circumstances for Noram to retain those benefits conferred upon it by Veolia without commensurate compensation.

49. Veolia is entitled to damages, and appropriate supplemental remedies in amounts and types to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Veolia respectfully requests that the Court enter a judgment on all claims in its favor and against Noram, awarding to Veolia the following:

a) All damages as described generally herein, including but not limited to repair/replacement costs and lost profits, in an amount to be proven at trial;

b) All pre- and post-judgment interest;

c) All costs Veolia incurred pursuing this action; and

d) Such other relief as the Court may deem just and proper.

Respectfully submitted,

OF COUNSEL:

Ralph A. Finzio
Robert A. Gallagher
TROUTMAN PEPPER HAMILTON
SANDERS LLP
Union Trust Building
501 Grant Street, Suite 300
Pittsburgh, PA 15219
(412) 454-5000
*ralph.finizio@troutman.com*
*robert.gallagher@troutman.com*

Dated: June 25, 2021

*/s/ Joanna J. Cline*
Joanna J. Cline (#5873)
Christopher B. Chuff (#5729)
Emily L. Wheatley (#6383)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE  19801
(302) 777-6500
*joanna.cline@troutman.com*
*chris.chuff@troutman.com*
*emily.wheatley@troutman.com*

*Attorneys for Veolia North America
Regeneration Services LLC*